**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. ____________________**

FABIO MAURICIO PALACIO, individually
and on behalf of all others similarly situated,

Plaintiff,

v. JURY TRIAL DEMANDED

HEAVEN HILL DISTILLERIES, INC.,
a Kentucky corporation,

Defendant.
________________________________________/

**NATIONWIDE CLASS ACTION COMPLAINT**

Plaintiff Fabio Mauricio Palacio brings this class action against defendant, Heaven Hill Distilleries, Inc. d/b/a Heaven Hill Brands, on behalf of all similarly situated consumers of Lunazul tequila.

## I. INTRODUCTION

1. Defendant markets its Lunazul line of tequilas as "100% DE AGAVE." This designation tells consumers that Defendant distills Lunazul products using *only* the *tequilana weber* blue variety of agave ("Blue Weber agave"), which is regarded as the gold standard. Like cognac and champagne, true tequila is a product of origin, native to select, designated tequila-producing regions within five states in Mexico: Jalisco, Guanajuato, Michoacán, Nayarit, and Tamaulipas. Per Mexican standards, Blue Weber agave is the only agave variety acceptable for use in the production of true tequila. Tequilas distilled using other sugars are deemed "mixto" tequilas, are of lesser quality, and command a lower price point. Otherwise stated, consumers pay a premium for agave spirits made from 100% Blue Weber agave.

2. Defendant's Lunazul line of premium tequilas includes no fewer than seven agave spirits labeled "100% DE AGAVE": Blanco, Reposado, Añejo, Cristalino, Humoso, Primero Reposado, and Primero Plata (collectively the "Lunazul Tequilas" or "Products").[1] Defendant sells Lunazul Tequilas nationwide and the entire product line derives from the initial distillation of Lunazul Blanco. All Lunazul Tequilas, that is, are distilled from the same base spirit.

3. Consumers pay a premium for 100% Blue Weber agave tequilas in part because Blue Weber is not harvested until the plants reach full maturity, which can take five to eight years. Farmers must also grow the plants within certain areas, employing traditional harvesting practices.

4. In or around 2018, faced with a Blue Weber shortage that caused prices to rise, Defendant began to adulterate its Lunazul Blanco base spirit with non-agave sugars to maintain (or increase) its profit margins. Consequently, Lunazul Tequilas are no longer 100% Blue Weber agave. Defendant continues, however, to market Lunazul Tequilas Products as "100% DE AGAVE" on its labels, in its advertising, and on its website, and still charges premium prices, knowing that the tequila in its bottles does not warrant the designation.

5. Testing of Lunazul Blanco, Lunazul Reposado, and Lunazul Añejo confirms that Lunazul Tequilas contain material amounts of ethanol not derived from agave plants, *i.e.,* Lunazul Tequilas are enhanced with ethanol other than that obtained from Blue Weber agave and are not "100% de agave." As all Lunazul Tequilas derive from Lunazul Blanco as a base spirit, all Lunazul Tequilas are similarly adulterated.

6. Defendant is not alone. In recent years, interested groups and journalists in Mexico have reported widespread fraud in the tequila industry and discovered that many major tequila

---

[1] *See Luna Azul Tequila*, Luna Azul Tequila, *available at* https://lunazultequila.com/ (last visited June 5, 2026); *Primero Tequila*, Luna Azul Tequila, *available at* https://lunazultequila.com/primero-tequila.php (last visited June 5, 2026).

producers and distributors have been adulterating their "100% de agave" Blue Weber tequilas. Their deceptive practices have been facilitated by the nonprofit, civil organization responsible for certifying "true" tequila in Mexico, *Consejo Regulador del Tequila, A.C.* (the "CRT"). The CRT presents itself as a Mexican regulatory agency, but it is a private organization controlled by representatives of titans of the spirits industry and major Mexican tequila producers—some of the same companies adulterating and mislabeling their products. Together, Defendant, its competitors, and the CRT have made millions in illegal profits selling adulterated tequilas at premium prices.

7. Plaintiff and consumers nationwide pay premium prices for Lunazul Tequilas because the Products purport to be "true" tequila, as represented on its labels. Plaintiff Palacio, for example, purchased a bottle of Lunazul Blanco, which—like every bottle of Lunazul tequila—represents in at least three places on its label that it is "100% de agave."



8. On the side of Plaintiff's bottle, Defendant also represents: "For over 250 years our family has produced the finest tequila from estate grown, 100% Blue Weber Agave passed down for generations. An Invention rich in tradition, Lunazul tequila's handcrafted quality is unmatched."




9. Alongside the labels on its bottles, Defendant represents on the Lunazul website: "All Agave. No Extras."[2] Defendant then boasts: "Handcrafted with 100% Blue Weber agave and zero additives, Lunazul is made for those who aren't impressed with excess."[3]

---

[2] *Our Tequilas*, Luna Azul Tequila, *available at* https://lunazultequila.com/our-tequilas.php (last visited June 15, 2026).

[3] *See id.*




10. Plaintiff and similarly situated consumers nationwide have unknowingly paid premium prices for non-premium Lunazul Tequilas for years in reliance on misleading labeling and marketing promising them 100% Blue Weber agave tequila.



11. Plaintiff would not have purchased or would have paid less for Lunazul Tequilas had he known the truth. Plaintiff intends to purchase the Products in the future if he can do so with the assurance that the prices charged for them will represent the market value of the spirits in Lunazul bottles.

12. Plaintiff brings claims for violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), negligence, and unjust enrichment to recover the amounts Defendant has overcharged him and the putative class for Lunazul Tequilas and to put an end to Defendant's illegal practices.

## II. PARTIES

### Plaintiff

13. Plaintiff is a resident and citizen of Florida and is otherwise *sui juris*. As detailed below, Plaintiff purchased the Products from establishments authorized to sell the Products in Florida. For example, in October 2025, Plaintiff purchased multiple bottles of Lunazul tequila from Best Buy Liquor, ABC Fine Wine, and Total Wine in Miami, Florida.

14. Plaintiff purchased the Products, in material part, because he believed they derived from 100% Blue Weber agave as represented on Defendant's website and their Products' labels. Before purchasing the Products, Plaintiff read and relied on Defendant's representations that the Products were "100% de agave." Plaintiff was unaware when he purchased the Products that Defendant had misrepresented the composition and ingredients of the Products, and he would not have purchased the Products or would have paid less for them had he known the truth.

**<u>Defendant</u>**

15. Defendant Heaven Hill Distilleries Inc. is a Kentucky for-profit corporation, headquartered in Bardstown, Kentucky, that manufactures, markets, and facilitates the sale of the Products at issue in this litigation. Defendant engages in business throughout the United States, including in the State of Florida.

16. Upon information and belief, Defendant designed and/or approved the labels and marketing of, the Products including the representation that they were "100 de agave." Defendant designed and/or approved the labels and marketing knowing that reasonable U.S. consumers would believe that the Products were made from 100% Blue Weber agave.

## III. JURISDICTION AND VENUE

17. This Court has subject-matter over this action pursuant to 28 U.S.C. § 1331 because it arises from Defendant's violations of the federal Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961, *et seq*. This Court may exercise supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because they are so related to the RICO claim (within the Court's original jurisdiction) that they form part of the same case or controversy under Article III of the United States Constitution. This case does not present novel or complex issues of state law that predominate over claims for which this Court has original jurisdiction, and there are no compelling reasons for declining supplemental jurisdiction over Plaintiff's claims that do not arise under RICO.

18. This Court also has subject-matter jurisdiction over this class action under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the matter is between citizens of different states.

19. Finally, this Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(A) of the Class Action Fairness Act of 2005 because: (i) there are more than

one hundred putative class members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) Plaintiff and Defendant are citizens of different states.

20. This Court has personal jurisdiction over Defendant pursuant to 18 U.S.C. § 1965(a), as well as Florida's long-arm statute, Fla. Stat. § 48.193. First, this Court has personal jurisdiction over Defendant under 18 U.S.C. § 1965(a) because Defendant transacts its affairs within this District. Defendant purposefully sells and has sold and distributed its products to consumers within this District and throughout the State of Florida, directed its marketing and sales activities at Florida consumers, and derived substantial revenue from those sales. The claims asserted herein arise directly from that conduct.

21. Second, this Court has personal jurisdiction over Defendant under Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(1) and (2), because Defendant operated, conducted, and carried on a business in Florida, and committed tortious acts within Florida, by selling its products to Florida consumers at artificially inflated prices as part of the fraudulent scheme alleged herein. Defendant has also caused injury to persons in this State though its acts and omissions outside this state, while its products were used or consumed within this state in the ordinary course of commerce, trade, or use.

22. Defendant purposely availed itself of the laws of the State of Florida by marketing and distributing the Products within Miami-Dade County, Florida and the State of Florida. Defendant’s purposeful availment of the privileges of doing business within the State and substantial, continuous, and systematic contacts with Florida render the exercise of jurisdiction by this Court over it permissible under traditional notions of fair play and substantial justice.

23. In accordance with 28 U.S.C. § 1391, venue is proper in this District because Defendant transacts business within this District and Defendant has intentionally availed itself of the laws and markets within this District.

24. Plaintiff seeks to hold Defendant, a U.S. company, liable for its misrepresentations and conduct aimed at U.S. consumers under U.S. law. All conditions precedent to this action have occurred, been performed, or have been waived.

## IV. FACTUAL ALLEGATIONS

25. ***100% Agave Tequila.*** Tequila's recent surge in popularity among consumers stems from several factors including its versatility; the perception that it is a healthier or "cleaner" choice than other spirits; a rise in popularity of craft cocktails and a related trend of consumers seeking premium beverage experiences; its cultural connection to Mexico; and the significant role of social media marketing, celebrity endorsements, and celebrity-owned brands in expanding tequila's appeal.

26. A trend towards "premiumization" has travelled alongside tequila's growing popularity. This trend is particularly prevalent among younger consumers. According to Grand View Research, 54% of consumers aged 34 and under prefer premium tequilas, citing taste, production integrity, and brand authenticity as major factors.[4] This demographic—accustomed to researching products before buying them—relies heavily on labels like "100% de agave" to assess quality. Moving forward, the premium segment is "expected to grow substantially."[5]

---

[4] Grand View Research, *Tequila Market Size, Share & Trends Analysis Report by Product (Blanco, Reposado, Anejo, Super Premium), By Grade (Value, Premium, High-End Premium, Super Premium), by Distribution Channel, by Region, and Segment Forecasts, 2024-2033)*, *available at* https://www.grandviewresearch.com/industry-analysis/tequila-market-report (last visited May 11, 2026).

[5] *Id.*

27. Production of 100% agave tequila increased 151% between 2018 and 2023, "reflecting growing consumer preference for higher-quality, authentic spirits."[6] Remarkably, this marked increase in production coincided almost exactly with a severe, multiyear Blue Weber agave shortage beginning in 2017.[7]

28. Like champagne and cognac, tequila is a product of origin. True tequila comes only from Mexico, and specifically, from the states of Jalisco, Tamaulipas, Nayarit, Michoacán, and Guanajuato. The CRT, a private, non-profit, civil organization "inspect[s], analyze[s], and certif[ies] compliance with the Official Mexican Standard for Tequila," NOM-006-SCFI-2012 (the "Tequila NOM"), to ensure that products sold as "true" tequila have earned the designation.[8]

29. According to the "Official Mexican Standard," a product labeled "100% agave [azul]" or "100% de agave" is "a product whose fermentation may not be enhanced with sugars other than those obtained from the *tequilana weber* blue variety agave grown in the territory specified in the Declaration" (*i.e.,* in the states of Jalisco, Tamaulipas, Nayarit, Michoacán and Guanajuato). The addition of sugar-based syrups in tequila "must not be more than 1% in relation to the total Tequila weight before it is bottled."[9]

30. "100% agave" tequila is different from, and commands a higher price than, "tequila" or "mixto" tequila. A key distinguishing difference between 100% agave tequila and "tequila" is that "tequila" may have "other sugars in a proportion not to exceed 49% of total

---

[6] *Id.*

[7] Reuters, *Soaring Agave Prices Give Mexican Tequila Producers a Headache*, Voice of America News, Feb. 6, 2018, *available at* https://www.voanews.com/a/soaring-agave-prices-give-mexican-tequila-makers-a-headache-/4242317.html (last visited May 11, 2026).

[8] The Tequila Regulatory Council, AC, *available at* https://www.crt.org.mx/sobre-nosotros/.

[9] *Official Mexican Standard NOM-006-SCFI-2012 Alcoholic Beverages -Tequila - Specifications Courtesy Translation*, *available at* https://www.crt.org.mx/wp-content/uploads/2024/01/NOM-006-SCFI-2012%20-%20INGLES.pdf.

reducing sugars expressed in units of mass. This maximum enhancement of up to 49% of total reducing sugars expressed in units of mass may not be done with sugars from any species of Agave."[10] However, "[t]he 51% of total reducing sugars expressed in units of mass may only be enhanced with *tequilana weber* blue variety agave . . . ."[11]

31. As such, to be labeled as "100% agave," "100% de agave," "100% puro de agave," or "100% puro agave" (inclusive of any combination of these labels with the word "azul" ["blue"]) the product may not be enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave grown in a specific, defined territory. The presence of other sugars impacts tequila's quality and taste, as the use of other sugars can alter the natural flavor profile of tequila.

32. The CRT "owns an incontestable federal registration for the certification mark TEQUILA (Registration No. 5225126)." Complaint [D.E. 1] at 6, *Consejo Regulador Del Tequila A.C. v. Additive Free Alliance*, No. 3:25-cv-00236 (M.D. Fla.). Because the CRT holds the U.S. certification mark, only producers certified by the CRT can legally use the term "Tequila" on products sold in the United States. *Id.* at 7. In other words, the CRT's control over the U.S. certification mark, together with its role in Mexico's regulatory regime, makes it the lone gatekeeper for what qualifies as "100% Agave" tequila under both Mexican and U.S. law. This monopoly gives the CRT—a nongovernmental body controlled by interested parties—significant influence over producers, including U.S. companies like Heaven Hill, by conditioning market access on CRT certification.

33. The CRT is further charged with monitoring tequila production practices on-site, including cooking, fermentation, distillation, and aging. This includes laboratory testing of tequila samples to verify key physicochemical parameters such as alcohol content, sugar concentration,

---

[10] *Id.*

[11] *Id.*

and the presence of non-permitted additives. According to the CRT website, its laboratory produces reliable results, which "are essential to demonstrate compliance with the specifications established in official national and/or international standards, thereby ensuring the quality of alcoholic beverages for the consumer."[12] The CRT's laboratory tests are supposed to help ensure that only authentic, unadulterated tequila is certified for domestic and international sales.

34. ***Reports of Tequila Adulteration.*** In January 2025, the Mexican business publication *Líder Empresarial* reported large-scale protests by thousands of agave growers who had accused major tequila producers of diluting their products with non-agave inputs such as cane alcohol.[13]

35. The Consejo Mexicano del Agave ("CMXDA"), a national organization representing agave farmers, substantiated these allegations, confirming that adulteration with cane-based spirits is both ongoing and widespread.[14]

36. On January 13, 2025, *Mezcalistas*, a respected trade site, published an article accusing the CRT—the organization charged with preserving tequila's integrity—of being "corrupt, in league with 'big tequila,' and tacitly supporting monopolistic practices that squeeze out small farmers."[15]

---

[12] Laboratory, The Tequila Regulatory Council, *available at* https://www.crt.org.mx/laboratorio/.

[13] Maria Hernandez Figueroa, *Agaveros exigen «eliminar monopolios» en la Industria Tequilera, Lider Empresarial*, LiderEmpresarial.com (Jan. 10, 2025), *available at* https://www.lideresempresarial.com/agaveros-exigen-eliminar-monopolios-en-la-industria-tequilera/ (last visited May 1, 2026).

[14] *See id.*

[15] Felisa Rogers, *Allegations of corruption raise serious questions about "fake tequila"*, Mezcalistas (Jan. 13, 2025), *available at* https://www.mezcalistas.com/tequila-industry-corruption/ (last visited June 5, 2026).

37. The article claims the CRT has "been turning a profit by allowing some tequila corporations to mix cane or corn alcohol into tequila that's then labeled as 100 percent agave."[16] These "alarming charges" are reportedly backed by eyewitness accounts from agave farmers who "have seen trucks delivering cane alcohol to distilleries, and have gathered enough proof to merit a government investigation."[17]

38. *Mezcalistas* attributed the "temptation to cut corners," in part, to the slow process of growing blue agave: "[B]lue agave takes a long time to mature—five to ten years—and that creates ongoing tension in the industry[.]"[18]

39. Remberto Galván Cabrera, the official spokesperson for the CMXDA, has explained that "when agave prices were high, large tequila companies began mixing cane alcohol into tequila that they sold as 100% agave."[19] Major tequila brands have been tested and these tests have uncovered the widespread adulteration of "100% de agave" tequila with non-agave sugars. This practice has become commonplace and remains ongoing.[20]

40. *Mezcalistas* has also reported that Salvador Ibarra Landeros, President of the Union Campesino Agavera (which translates roughly as "the rural agave union"), attributes widespread adulteration to cooperation between the CRT and the tequila industry: "The tequila industry is regulated by the very same people who own the distilleries. The government has put the power in

---

[16] *Id.*

[17] *Id.*

[18] Felisa Rogers, *What are you drinking? Agave farmers allege tequila industry corruption*, Mezcalistas (Jan. 13, 2025), *available at* https://www.mezcalistas.com/tequila-industry-corruption/.

[19] Felisa Rogers, *Agave farmers say they will no longer play nice*, Mezcalistas (Jan. 15, 2025), *available at* https://www.mezcalistas.com/breaking-tequila-news/.

[20] *See id.*

the hands of the CRT, which is an organization created for the businessmen. The people that work at the CRT respond to the orders of their bosses, the businessmen who appointed them."[21]

41. The same article reported that agave farmers had planned to block tanker trucks from entering the Tequila region to prove that cane alcohol was being delivered to distilleries.[22] The tankers "could be viewed as evidence of foul play," the article explained, because "'cold mixing,' or adding cane or corn alcohol to tequila, is illegal under any circumstances."[23]

42. Protest organizers ultimately "dialed back this action when recently elected Governor Pablo Lemus Navarro (of the Movimiento Ciudadano party) agreed to convene with the [agave farmers], the tequila executives, and the CRT to work on a solution."[24] The Governor, however, failed to attend the meeting.[25] When asked to respond, CMXDA spokesperson Remberto Galván Cabrera stated: "The truth is that the tequila industry, the governor of the state, and the CRT are colluding. Yesterday I saw clearly that there isn't a human power on this earth that can get rid of the corruption of this nest of vipers."[26]

43. ***Nuclear Magnetic Resonance Testing Confirms the Products' Adulteration.*** Plaintiff's counsel commissioned Site-Specific Natural Isotope Fractionation-Nuclear Magnetic Resonance ("SNIF-NMR" or "NMR") laboratory testing to determine, by way of carbon isotope ratio analysis, whether Lunazul Tequilas have been adulterated with non-agave alcohol.

44. This technique, which is widely accepted in food chemistry (including by Mexico's *Centro Nacional de Metrologia* ("CENAM"), its national reference laboratory for measurements),

---

[21] *See id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

identifies the plant origin of ethanol in a spirit by measuring its natural carbon fingerprint. This fingerprint—known as a stable carbon isotope ratio ($\delta^{13}C$)—can be used to identify the plant source of the sugars used in fermentation.

45. Specifically, carbon composition is analyzed at two parts of the ethanol molecule: the methylene group ($CH_2$) and the methyl group ($CH_3$). Ethanol made from Blue Weber agave shows a distinct isotope signature compared to ethanol made from cheaper feedstocks like corn or sugarcane, which are $C_4$ plants.[27]

46. A foundational 2010 study confirmed this distinction and the ability of NMR testing to differentiate between authentic 100% agave tequila and other tequila products. NMR testing detects the adulteration of tequila labeled as 100% agave by identifying the presence of ethanol derived from sources other than Blue Weber agave. Ethanol made from $C_4$ plants such as corn and sugarcane, for example, shows $\delta^{13}C(CH_2)$ values near –13.5‰.[28] Agave-derived ethanol, by contrast, falls within a range of –7.0‰ to –9.0‰.[29]

47. Testing commissioned by Plaintiff's counsel in October and November 2025 confirmed that Lunazul Tequilas do not meet the standards for tequila labeled as 100% agave. Two bottles of Lunazul Blanco purchased from retailers in the United States yielded $\delta^{13}C(CH_2)$ values of -12.7 (± 0.5)‰ and -12.8 (± 0.5)‰, respectively. These isotopic parameters do not match those produced by 100% agave tequilas and confirm that the bottle tested was adulterated with non-agave sugars.

48. The testing results for Lunazul Blanco implicate the entire range of the Products as all Lunazul Tequilas derive from the same base spirit. This has been confirmed by testing of bottles

---

[27] *See* Freddy Thomas, *et al.*, *Improved Characterization of the Botanical Origin of Sugar by Carbon-13 SNIF-NMR Applied to Ethanol*, 58 J. AGRIC. FOOD CHEM. 11580, 11580-81 (2010).

[28] *Id.* at 11583.

[29] *Id.*

of Lunazul Reposado and Añejo, purchased from different stores than the earlier-tested bottles of Lunazul Blanco.

49. Testing of Lunazul Reposado yielded a result of a $\delta^{13}C(CH_2)$ value of –13.5 (± 0.5)‰ and a $\delta^{13}C(CH_3)$ value of –14.1 (± 0.5)‰. Testing of Lunazul Añejo yielded a result of a $\delta^{13}C(CH_2)$ value of -13.2 and a $\delta^{13}C(CH_3)$ value of –12 (± 0.5)‰. The isotopic parameters of these Products were not in agreement with the parameters of 100% agave tequila, nor would either of these results qualify the bottles tested as "100% de agave."

50. Testing of other major-brand tequilas has yielded similar results and confirms that this is a market-wide problem. In related litigation against Costco (for its Kirkland branded tequilas), Diageo (for its Casamigos and Don Julio branded tequilas), and Constellation Brands (for its Casa Noble branded tequilas), plaintiffs have alleged that NMR testing of Kirkland Blanco, Reposado, and Extra Añejo varieties yielded test results ranging from $\delta^{13}C_CH2$ = –12.4‰ to $\delta^{13}C(CH_2)$ = –13‰; while three varieties of Casamigos and two varieties of Don Julio tequila yielded results ranging from $\delta^{13}C(CH_2)$ = –10.5‰ to $\delta^{13}C(CH_2)$ = – 13.4‰; and three varieties of Casa Noble tequila yielded results ranging from $\delta^{13}C(CH_2)$ = –10.5‰ to $\delta^{13}C(CH_2)$ = – 13.4‰.[30]

51. Plaintiff purchased Lunazul Tequilas based on Defendant's representations that the Products were "true," premium tequila ("100% DE AGAVE") and would not have paid premium prices for Lunazul Tequilas but for deceptive labeling and advertisements. The Products were overpriced given that they were not in fact made from 100% Blue Weber agave as represented.

52. Plaintiff regularly shops at liquor stores, bars, and restaurants that sell Lunazul Tequilas. Because the composition of tequila cannot be determined by visual inspection, Plaintiff

---

[30] *See* Am. Compl. [D.E. 25] at ¶¶ 80-84, *Salisbury et al. v. Costco Wholesale Corp.*, No. 2:25-cv-02277 (W.D. Wash. Mar. 9, 2026); Am. Compl. [D.E. 23] at ¶ 47, *Pusateri v. Diageo N. Am., Inc.*, No. 1:25-cv-02482 (E.D.N.Y. Sept. 12, 2025); Am. Compl. [D.E. 32] at ¶¶ 45,47, *Johnson et al. v. Constellation Brands, Inc., et al.*, No. 1:25-cv-25926-DPG (S.D. Fla. May 14, 2026).

cannot determine, and will never be able to determine, whether Defendant has stopped adulterating the Products. As a result, the risk that Plaintiff and those similarly situated will again be deceived and/or overpay for the Products is real, immediate, and ongoing.

53. Plaintiff and the Class members reasonably relied on Defendant's representations and could not have discovered, through the exercise of reasonable due diligence, that Defendant was misrepresenting and actively concealing the true nature of the Products. This concealment prevented Plaintiff and the Class members from discovering the actual composition of the Products.

54. Further, given the specialized and technical knowledge required to detect adulteration, Plaintiff and the Class members could not have discovered that the Products were not 100% agave on their own.

## V. CLASS ALLEGATIONS

55. Plaintiff brings this action individually and as a representative of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined classes:

A. **The Nationwide Class:** All persons who purchased one or more of the Products in the United States within the applicable limitations period.

B. **The Florida Subclass:** All persons who purchased one or more of the Products in Florida within the applicable limitations period.

56. Excluded from each class are Defendant, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and persons who properly execute and file a timely request for exclusion from the Class.

57. The classes described in this Complaint may be jointly referred to as the "Class" or "Classes" and members of the proposed classes may be jointly referred to as "Class members."

58. Plaintiff reserves the right to amend or modify the Class definitions with greater specificity, further division into subclasses, or with limitation to particular issues as discovery and the orders of this Court warrant. In addition, the Court can define the Classes and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the Class members if, based on discovery of additional facts, the need arises.

59. Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief and damages appropriate with respect to the Classes as a whole. Defendant presently and continuously falsely markets and sells the Products as tequila made from 100% agave despite using sugars that were not derived from the Blue Weber agave variety, and absent injunctive relief will continue doing so, thereby subjecting Plaintiff to an ongoing risk of future deception and economic injury whenever he encounters or purchases the Products.

60. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

61. As set forth in detail below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

**<u>Numerosity/Manageability</u>**

62. This action satisfies the requirements of Rule 23(a)(1). The members of the Class are so numerous that individual joinder of all Class members is impracticable. On information and belief, the Class members number in the thousands. Defendant sells at least tens of thousands of

cases of its tequila Products each year. The precise number or identification of members of the Class is presently unknown to Plaintiff but may be ascertained from (i) Defendant's books and records, (ii) the books and records of third-party retailers that maintain records of Class member purchases and contact information, and (iii) industry statistics. By way of example, upon information and belief, Florida is the third largest consumer of tequila in the United States.[31]

63. Plaintiff anticipates providing appropriate notice to the Class members in compliance with Rule 23. By way of example, Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, email, text messages, social media, online advertisements, and/or published notice.

**<u>Commonality</u>**

64. This action satisfies the requirements of Rule 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each member of the Classes. These common questions predominate over any questions affecting only individual Class members. The predominating common or Class-wide fact questions include, but are not limited to, whether:

a. Lunazul Tequilas are "100% de agave";

b. Defendant's marketing of Lunazul Tequilas is likely to deceive or mislead reasonable consumers;

c. Defendant knew, or was willfully blind to the fact, that the spirits in its bottles were adulterated with non-agave sugars;

d. Defendant has been negligent in representing its Products as 100% Blue Weber Agave;

e. Defendant charged a premium price for non-premium tequila;

---

[31] Jan Conway, *U.S. Tequila Consumption 2023, By State*, Statista (Feb. 13, 2025), https://www.statista.com/statistics/486797/tequila-consumption-united-states-by-state/#:~:text=In%202023%2C%20tequila%20consumption%20in,ranking%20second%20and%20third%20respectively.&text=Tequila%2C%20an%20agave%2Dbased%20distilled,beverages%20in%20the%20United%20States.

f. Defendant used the U.S. mails and wires in furtherance of a fraudulent scheme;

g. Plaintiff and the Class members conferred a benefit on Defendant;

h. Defendant unjustly retained a benefit conferred by Plaintiff and the Class; and

i. Damages, restitution, equitable, injunctive, declaratory, or other relief is warranted.

**<u>Typicality</u>**

65. This action satisfies the requirements of Rule 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct of Defendant.

66. Each Class member purchased one or more of Defendant's Products and thus as a result has sustained, and will continue to sustain, damages in the same manner as Plaintiff. So long as Defendant maintains the "100% de agave" and related purity representations while adulterating the Products with non-agave ethanol, each Class member faces a continuing risk of economic injury each time they encounter the Products. The relief Plaintiff seeks in this action is typical of the relief sought for the absent Class members.

**<u>Adequacy of Representation</u>**

67. This action satisfies the requirements of Rule 23(a)(4). Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is committed to the vigorous prosecution of this action and there is no hostility or conflict between or among Plaintiff and the unnamed Class members. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

68. To prosecute this case, Plaintiff has chosen the undersigned law firms, which have substantial experience in the prosecution of large and complex class action litigation and have the financial resources to meet the costs associated with the vigorous prosecution of this type of

litigation. Plaintiff and his counsel will fairly and adequately protect the interests of all Class members.

**Superiority/Predominance**

69. This action satisfies the requirements of Rule 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who own or have purchased any of the Products.

70. Because the monetary damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Defendant, by even a small fraction of the Class members, would be enormous.

71. In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member. The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is simply superior to other alternative procedures for handling the class action given the particular circumstances.

72. Plaintiff is unaware of any obstacles likely to be encountered in the management of this lawsuit that would preclude its maintenance as a class action. The damages or other financial detriment suffered by Plaintiff and the Class members are relatively small compared to the burden

and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

## VI. CLAIMS FOR RELIEF

### COUNT I – Violation of Racketeer Influenced and Corrupt Organizations Act – 18 U.S.C. § 1962(c)
**(by Plaintiff on behalf of the Nationwide Class against Defendant)**

73. Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

74. At all times relevant, Defendant was employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c).

75. The RICO enterprise Defendant engages in, and the activities of which affect interstate and foreign commerce, is comprised of an association-in-fact of entities and individuals including, but not limited to, Defendant; the Mexican distillery that manufactures and bottles Lunazul Tequilas, Tierra de Agaves Distillery (NOM 1559) ("Tierra de Agaves"); the CRT; and the controlling members of the CRT's Board of Directors and committees, which includes, among

others, representatives from Mexican distilleries and from some of the largest spirits companies in the world, including Diageo, Casa Cuervo, and Brown-Forman.

76. The members of the RICO enterprise had a common purpose: to manipulate the market for "true" tequila, together with other tequila producers and distributors, by adulterating Lunazul Tequilas and deceiving consumers into paying a premium price for adulterated tequila certified as 100% Blue Weber agave.

77. Within the RICO enterprise, there was a common communication network through which Defendant and the other members of the enterprise shared information on a regular basis. The enterprise established this communication network before it engaged in the subject racketeering activities, in connection with other business activities, but used the network in furtherance of its common purpose and its pattern of racketeering activities.

78. The RICO enterprise has functioned (and continues to function) over a period of years as a continuing unit and has maintained an ascertainable structure separate and distinct from the pattern of racketeering activity described herein. In fact, Defendant, Tierra de Agaves, the CRT, and its members have operated in relation to one another since approximately 2008, in connection with the production, bottling, labeling, certification, and distribution of Lunazul Tequilas and, for a time, the production, bottling, labeling, certification, and distribution of Defendant's other branded tequila, La Certeza.

79. The members of the RICO enterprise conducted and participated in its affairs through a pattern of racketeering activity that lasted more than one year and consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

80. Specifically, Defendant has committed, conspired to commit, and aided and abetted the commission of more than two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 & 1343). Defendant's numerous acts of racketeering activity were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

81. The racketeering activity was made possible by Defendant's regular and knowing use of the facilities, services, distribution channels, and employees of the alleged enterprise. Defendant knowingly and intentionally participated in the scheme to defraud by using the mail, telephone, and the internet, including electronic mail, to transmit mailings and wires in interstate and foreign commerce.

82. Specifically, for the purpose of executing the scheme to defraud, Defendant and the other enterprise members have sent, mailed, and transmitted, or caused to be sent, mailed or transmitted, in interstate or foreign commerce numerous materials, including but not limited to communications between Defendant and Tierra de Agaves about the production, bottling, and labeling of Lunazul Tequilas; payments to Tierra de Agaves for its services; direct or indirect payments to the CRT for laboratory analyses, certifications, and compliance audits; invoices to sellers of Lunazul Tequilas throughout the United States (bearing false prices/overcharges for Lunazul Tequilas); pricing information to sellers of Lunazul Tequilas; shipments of Lunazul Tequilas from Mexico to the United States (and throughout the United States); marketing materials for Lunazul Tequilas, including print advertising and other promotional materials; and communications among the enterprise members regarding the production, certification, distribution, and marketing of Lunazul Tequilas.

83. The mail and wire transmissions described herein were made in furtherance of the enterprise's scheme and common course of conduct to deceive consumers and lure them into

purchasing the Lunazul-branded Products, which Defendant knew were adulterated with non-agave sugars and, therefore, were not "100% de agave."

84. Defendant and its co-conspirators have possession, custody, and control of the documents and communications they transmitted through the U.S., interstate, and international mails and wires such that Plaintiff lacks access to the precise dates of these documents and communications. Defendant, however, executed these transmissions routinely throughout the Class Period and continues to do so, as the scheme alleged herein is ongoing.

85. Defendant, in furtherance of the enterprise's RICO scheme, misrepresents to consumers on its labels and in its advertising that all varieties of Lunazul Tequilas are 100% de agave tequilas, or "true," unadulterated, premium tequilas, including by labeling and advertising them to consumers, including Plaintiff and the putative Class members, as "100% de agave."

86. Defendant also charges false, inflated prices for its tequilas, which further represent to consumers, including Plaintiff and the putative Class members, that Lunazul Tequilas are 100% Blue Weber agave premium tequilas.

87. Defendant directed and controlled the enterprise by, *inter alia*:

- Deciding or agreeing to adulterate its Lunazul-branded Products with non-agave sugars;
- designing or directing the design of, and ordering or manufacturing, the labels for Lunazul Tequilas, which represented that Lunazul Tequilas were 100% de agave;
- designing or directing the design of advertising and other promotional campaigns for Lunazul Tequilas, representing that Lunazul Tequilas were premium tequilas;
- setting premium prices for Lunazul Tequilas, which did not correspond to the value of the adulterated tequila in Lunazul-branded bottles;

- paying Tierra de Agaves to distill and bottle adulterated tequila;
- together with Tierra de Agaves, paying the CRT for laboratory analyses, certifications, and compliance audits under the Tequila NOM; and
- directing the distribution of Lunazul-branded Products throughout the United States, including Florida.

88. Defendant either directs Tierra de Agaves to adulterate the Lunazul-branded Products or turns a willful blind eye to Tierra de Agaves' adulteration of Lunazul Tequilas, and works with Tierra de Agaves and the CRT, by express or implied agreement, to ensure that testing results do not reveal that the Products contain non-agave sugars. Defendant knows that its conduct will ensure that Tierra de Agaves will continue to adulterate Lunazul Tequilas and the CRT will grant a false certification of the Products as "100% de agave" tequila.

89. All told, Defendant markets and sells the Products in the United States knowing that the "100% de agave" claims on every bottle of its tequila, on its website, and in its advertisements and promotions are false and misleading because the Lunazul-branded Products are adulterated with non-agave alcohols.

90. Plaintiff and the putative Class members have been injured by reason of Defendant's and the enterprise's fraudulent scheme because they paid premium prices for adulterated Lunazul Tequilas and would have paid less, or not purchased them at all, had they known that Lunazul Tequilas are not "100% de agave" or that the premium prices charged for the Products do not correspond to the Products' market value.

91. As redress for their injuries, Plaintiff and the Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

**COUNT II – Violation of Racketeer Influenced and Corrupt Organizations Act – 18 U.S.C. § 1962(d)**
**(by Plaintiff on behalf of the Nationwide Class against Defendant)**

92. Plaintiff re-alleges and incorporates paragraphs 1 through 72 and 74 through 91 of this complaint as if fully set forth herein and further alleges as follows.

93. At all relevant times, Defendant was associated with the enterprise defined in Count I and agreed and conspired to violate 18 U.S.C. § 1962(d). Defendant agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

94. Defendant illegally agreed to violate RICO, 18 U.S.C. § 1962(d). For example, *inter alia*, Defendant:

(a) Labeled and advertised its Products as 100% de agave knowing that its Products were adulterated with non-agave sugars and did not satisfy the Mexican standards for 100% Blue Weber agave tequilas;

(b) together with Tierra de Agaves, paid the CRT for laboratory analyses, certifications, and compliance audits under the Tequila NOM, knowing that the CRT would certify Lunazul-branded adulterated Products as "100% de agave";

(c) distributed and charged premium prices for the Products, knowing that the Products did not satisfy the Mexican standards for 100% Blue Weber agave tequila; and

(d) continued to pay Tierra de Agaves to distill and bottle adulterated tequila Products under the Lunazul name.

95. Defendant committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above and in paragraph 87, *supra*.

96. As a result of Defendant's violations of 18 U.S.C. § 1962(d), Plaintiff and the Class

members suffered damages by paying unreasonably inflated prices for the Products.

97. Plaintiff, on behalf of the Nationwide Class, seeks compensatory and treble damages, as well as attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

**COUNT III – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), FLA. STAT. § 501.201 *ET SEQ*.**
**(by Plaintiff on behalf of the Florida Subclass against Defendant)**

98. Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

99. Plaintiff and the Florida Subclass members are "consumer[s]" engaged in "trade or commerce" within the meaning of FDUTPA. § 501.203 (7), (8), Fla. Stat.

100. Defendant engaged in "trade or commerce" within the meaning of FDUTPA. § 501.203(8), Fla. Stat.

101. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat.

102. Defendant engaged in unfair and deceptive trade practices that violated FDUTPA, by representing that its Products were 100% de agave, pure tequila made of 100% Blue Weber agave.

103. Defendant knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers.

104. Defendant knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

105. Defendant actively concealed and misrepresented the true nature of how its Products were manufactured and the composition of their Products. Indeed, Defendant concealed and misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana*

*weber* blue variety of agave to enhance its tequila, despite the Products being labeled as "100% de agave."

106. Defendant intended for Plaintiff and the Florida Subclass members to rely on its misrepresentations and omissions so that Plaintiff and the Florida Subclass members would purchase the Products at a premium price.

107. Defendant's unfair and deceptive acts and practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Plaintiff and the Florida Subclass members, about the quality and true value of the Products.

108. Defendant intentionally and knowingly misrepresented or omitted material facts, or was willfully blind to such facts, regarding the use of Blue Weber agave with an intent to mislead Plaintiff and the Florida Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

109. Plaintiff and the Florida Subclass members have been injured by Defendant's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Plaintiff and the Florida Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety agave grown in the requisite territory.

110. Defendant's failure to disclose, and active concealment of, its use of non-agave sugars to ferment the Products, inclusive of the actual amount of Blue Weber agave used, was material to Plaintiff and the Florida Subclass members.

111. Plaintiff and the Florida Subclass members have suffered ascertainable losses as a result of Defendant's misrepresentations and omissions about the Products. Had they been aware

of the true nature and composition of the Products, they either would have paid less for the Products or would not have purchased the Products. Plaintiff and the Florida Subclass members did not receive the benefit of their bargain due to Defendant's misconduct.

112. As a direct and proximate result of Defendant's violations of FDUTPA, Plaintiff and the Florida Subclass members have suffered injury-in-fact and actual damages.

113. Plaintiff and the Florida Subclass members are entitled to recover their actual damages under § 501.211(2), Fla. Stat. and attorneys' fees under § 501.2105(1), Fla. Stat.

114. Plaintiff and the Florida Subclass members have suffered and will continue to suffer irreparable harm if Defendant continues to engage in such deceptive, unfair, and unreasonable practices.

115. Because Defendant's false "100% de agave" and purity representations remain on the Products' labels, and on Defendant's marketing, Plaintiff and the Florida Subclass face a real and immediate threat of future injury in the form of purchasing the Products again and risk paying a premium for tequila that is not truly 100% agave, or refraining from purchasing Products they would otherwise buy but for their inability to rely on Defendant's labeling.

116. Plaintiff, on behalf of the Florida Subclass, requests that the Court award them actual damages and issue an order requiring Defendant to properly notify the Florida Subclass members of the true nature of how the tequila Products are made and the amount of Blue Weber agave used to make them, as well as award Plaintiff and the Florida Subclass members attorneys' fees and any other just and proper relief available under FDUTPA. Plaintiff, on behalf of the Florida Subclass, further seeks an injunction to prohibit Defendant from charging a premium price for tequila that is not 100% agave.

**COUNT IV –NEGLIGENCE**
**(by Plaintiff on behalf of the Nationwide Class against Defendant)**

117. Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

118. Plaintiff brings Count IV for common law negligence in the alternative to Counts I and II for violations of the federal RICO statute.

119. Defendant had a duty to ensure that its labels, advertisements, and website accurately represented the contents of Lunazul Tequilas.

120. Specifically, Defendant owes a duty to its consumers to confirm that the Products it sold in the United States were 100% agave and not adulterated.

121. Defendant breached its duties to Plaintiff and the Nationwide Class by failing to confirm that the Products were unadulterated or otherwise turning a blind eye to the fact that Lunazul Tequilas were adulterated and, consequently, misleading consumers regarding the nature of the Products.

122. As a result of Defendant's breaches of its duties of care, Plaintiff and the Nationwide Class members suffered actual damages that arose from the natural and foreseeable consequences of Defendant's conduct, in that the adulterated Products were not 100% agave, and, therefore, were not worth the premium price Plaintiff and Nationwide Class members paid.

123. Plaintiff and the Nationwide Class seek to recover the amounts they overpaid for Lunazul Tequilas as well as any other just and proper relief available to them as a result of Defendant's negligence.

**COUNT V – UNJUST ENRICHMENT**
**(by Plaintiff on behalf of the Nationwide Class against Defendant)**

124. Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

125. The Florida Subclass brings unjust enrichment claims in the alternative to their FDUTPA claims.

126. Plaintiff and the Nationwide Class members conferred benefits upon Defendant.

127. Plaintiff and the Nationwide Class members paid premium prices for the Products, which they would not have purchased or would not have purchased at the same price, had they known that they were enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave.

128. Defendant has unjustly retained the benefits conferred upon by Plaintiff and the Nationwide Class members.

129. Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits.

130. Defendant retained these benefits even though the Products were enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave.

131. If Plaintiff and the Nationwide Class members had known the true nature of the Products, they would not have purchased the Products.

132. Plaintiff requests that the Court disgorge Defendant's profits and return to Plaintiff and the Class members the amounts they conferred on Defendant that were unjustly received.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests that the Court:

a. Certify the proposed Classes, appoint Plaintiff as the class representative, appoint Plaintiff's Counsel as Class Counsel, and make such further orders for the protection of Class members as the Court deems appropriate;

b. enjoin Defendant from engaging in the unlawful conduct alleged herein, and order such other injunctive relief that the Court deems just and proper;

c. award compensatory damages to Plaintiff and the Class members, including punitive damages, statutory damages, costs, and disgorgement in an amount to be determined at trial;

d. award treble damages to Plaintiff and the Class members, pursuant to 18 U.S.C. § 1964(c);

e. award Plaintiff and Class members pre-judgment and post-judgment interest, as provided by law;

f. award Plaintiff and Class members their reasonable attorneys' fees and costs as allowed by law;

g. enter an order holding Defendant financially responsible for all Class notice and the administration of Class relief; and

h. grant Plaintiff and the Class members any other relief as this Court deems just, equitable, and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial for any and all issues triable by a jury.

Dated: June 15, 2026.

**[*Signature block appears on the following page.*]**

Respectfully submitted,

**RENNERT VOGEL MANDLER & RODRIGUEZ, P.A.**
Miami Tower, Suite 2900
100 S.E. Second Street
Miami, Florida 33131
Telephone (305) 577-4177
servicedanielmaland@rvmrlaw.com
servicerobertstein@rvmrlaw.com
servicesandramejia@rvmrlaw.com
servicecatherinewachtell@rvmrlaw.com

*/s/ Daniel S. Maland*
Daniel S. Maland, Esq.
Florida Bar No. 114932
dmaland@rvmrlaw.com
Robert M. Stein, Esq.
Florida Bar No. 93936
rstein@rvmrlaw.com
Sandra E. Mejia, Esq.
Florida Bar No. 1026047
smejia@rvmrlaw.com
Catherine L. Wachtell, Esq.
Florida Bar No. 1037182
cwachtell@rvmrlaw.com

*and*

**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Boulevard
9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
Robert J. Neary, Esq.
Florida Bar No. 81712
rn@kttlaw.com
Rachel Sullivan, Esq.
Florida Bar No. 815640
rs@kttlaw.com
Abe Andrew Bailey, Esq.
Florida Bar No. 1010335
abailey@kttlaw.com

*Counsel for Plaintiff*
*and the Proposed Classes*